UNITED STATES, Appellee

v

HASSO SCHEUNEMANN, Private First Class,
U. S. Army, Appellant

14 USCMA 479, 34 CMR 259

*Captain Daniel H. Benson* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Captain Robert E. Shepherd, Jr.*

*First Lieutenant Mervyn Hamburg* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

*Lieutenant General Lewis B. Hershey,* Director, and *Daniel O. Omer, Esquire,* General Counsel, Selective Service System, on *amicus curiae* brief.

## Opinion of the Court

KILDAY, Judge:

Appellant was tried by general court-martial, convened at Frankfurt, Germany, charged with absence without proper authority, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886. He entered a plea of not guilty, but was found guilty as charged. Appellant was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be reduced to the lowest enlisted grade. The convening authority reduced the forfeitures to $28.00 per month for one year, and otherwise approved the sentence.

A board of review in the office of The Judge Advocate General of the Army affirmed the findings but approved only so much of the sentence as provides for bad-conduct discharge, forfeiture of $28.00 per month for one year (application of the forfeitures deferred until the sentence is ordered into execution), and reduction to the lowest enlisted grade.

This Court granted review on two issues:

(1) Whether the court-martial lacked jurisdiction over the accused; and,

(2) Whether the law officer erred in his instruction on accused's alleged mistaken belief as to his military status, by applying a standard of reasonableness in addition to honesty.

By invitation of this Court, the Director of Selective Service filed a brief as *amicus curiae.*

Prior to his plea, appellant moved to dismiss the charge and specification because of lack of jurisdiction in the court-martial. At an out-of-court hearing on the motion to dismiss, the appellant testified. He also testified on the merits, prior to findings.

The substance of appellant's testimony is that he is a German citizen. He entered the United States in 1957, on a visitor's visa, to visit relatives in this country and to learn the English language. His visa permitted him to remain for six months. At the expiration of six months appellant returned to Germany. Being a member of the German Merchant Marine, appellant was temporarily in the United States every three weeks, for overnight stops, during the period between his departure from the United States and his subsequent re-admission.

Appellant again entered the United States in 1958, under a visitor's visa, as before. In accordance with the direction of an immigration officer that he report within four days to a Selective Service Board, appellant did so report and registered in accordance with the Universal Military Training and Service Act, Title 50, Appendix, §§ 451–473. United States Code, 62 Stat 604. Subsequently, appellant applied for permanent residence, but his application was denied for lack of prosecution. He was ordered to report for a physical examination and did so. On

August 27, 1959, appellant was drafted into the United States Army. After basic training in the United States, covering some four months, appellant was assigned to the Third Armored Division (Spearhead), stationed in Germany.

Appellant testified that he protested his induction to the draft board; to the immigration authorities; to his commanding officer at Fort Dix, New Jersey; to his personnel officer in Germany; and to the representative of the German government in his home town in Germany. He also claimed he contacted the German Consulate in the United States. On one occasion he returned to the United States, on leave, for the purpose of presenting his case to the immigration authorities. He admitted that on that visit to the United States he married, and that his wife joined him at his station in Germany. Neither his Selective Service record nor his Army record contains any protest by him. He did not appeal, within the Selective Service System, from any decision made by his draft board; and, while he testified he asked about it, he admitted he never made any application, in writing, to the military authorities for release from the service.

On his first admission to the United States, appellant remained for six months; and on his second admission, the same having been extended, he remained for some ten months, prior to his induction.

After having served some twenty-one months of the two-year term of service for which he was drafted, appellant left his unit without any authorization. He stated he had a dispute with his commanding officer over his marital relations, had been abused by his commanding officer as a "dirty German," and had been deprived of his assignment as a driver of the mail truck because he was an alien. He was desirous of securing a divorce, went to Switzerland for that purpose, and secured his divorce. He remarried, moved to West Berlin, secured a position, and a child was born. After having been absent from his unit for one year, nine months and twenty-five days, appellant turned himself in.

Seven months and thirteen days after absenting himself from his unit, appellant wrote a letter from Switzerland, to Headquarters, United States Army, Europe, requesting a discharge from the military service of the United States. He was informed, by letter, that he had been dropped from the rolls of the Army as a deserter and that military directives precluded authorizing his separation. Appellant also testified that while absent he wrote to the Third Armored Division, requesting his release, but received no reply. While the reply from Headquarters, United States Army, Europe, is in his file and is in the record of trial, there appears to be no record of the letter he testified he wrote the Third Armored Division.

This record reflects, without any dispute, that appellant registered with his draft board. In accordance with the direction of that board, he appeared for, took, and passed the physical examination. He appeared, as directed, at the induction center and was "actually inducted" into the Army. He took the oath as required. At the time of his induction he signed a document entitled "Acknowledgement of Service Obligation" which stated, in part:

"I, HASSO SCHEUNEMANN, having been inducted into the Army of the United States on this 27th day of Aug 59 for 2 years active duty, acknowledge that I have been informed of my service obligation."

The document then detailed his obligated service in the reserve.

Appellant specifically admitted that prior to leaving his organization he received his pay for "soldiering"; that he accepted his pay and did not tell the pay officer he did not want the money; that he wore the uniform; that he obeyed orders; that he was promoted, and accepted the promotion; and, as previously noted, was granted and accepted leave to return to the United States, at the termination of which he returned to his organization.

In his motion to dismiss at his court-martial, before the board of review, and now before this Court, appellant contends he was illegally inducted. Appellant bases his argument upon the lan-

guage of a provision of the Universal Military Training and Service Act, Title 50, Appendix, United States Code, Section 454(a), the pertinent portion of which reads:

". . . any male alien who is between the ages of 18 years and 6 months and 26 years, at the time fixed for registration, . . . who has remained in the United States in a status other than that of a permanent resident for a period exceeding one year . . . shall be liable for training and service in the Armed Forces of the United States, except that any such alien shall be relieved from liability for training and service under this title [said sections] if, prior to his induction into the Armed Forces he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President; but any alien who makes such application shall thereafter be debarred from becoming a citizen of the United States."

Appellant argues that the language of this statute covers an alien who has remained in the United States for a single continuous period of one year, and cites authorities in which the word "period" has been defined or construed.

The Government counters that the language "for a period exceeding one year" means not only one single continuous period, but also intermittent periods of less than one year which in the aggregate amount to "a period exceeding one year." Thus, the Government argues that appellant, having remained in the United States for six months after his first admission, and ten months after his second admission, had remained in the United States for a period exceeding one year.

The Selective Service System, in its brief as *amicus curiae,* points out that the Universal Military Training and Service Act, as amended, provides:

"The President is authorized—

"(1) to prescribe the necessary rules and regulations to carry out the provisions of this title." [Title 50 App, USC § 460(b)(1); 62 Stat 619.]

The statutory provision with which we are concerned was adopted by Congress in 1951. Practically simultaneously therewith the President promulgated Section 1622.42(a) of the Selective Service Regulations, reading:

"(a) In Class IV-C shall be placed any registrant who is an alien and who has not been admitted to the United States for permanent residence and who has not remained in the United States for a period exceeding one year. *When such a registrant has been within the United States for two or more periods of less than one year and the total of such periods exceeds one year, he shall be deemed to have remained in the United States for a period exceeding one year.* . . . When any such registrant has remained in the United States for a period exceeding one year, he becomes liable for training and service in the Armed Forces of the United States. . . ." [Emphasis supplied.] [32 CFR 1622.42(a).]

It is pointed out that this regulation has been in existence for twelve years and has never been brought into question. Further, that since 1951 and while said regulation has been in existence, the Congress has on three occasions[1] amended portions of Title 50 App, USC, § 454, supra, but has not amended this particular provision, nor has Congress taken any action to affect the regulation of the President quoted hereinbefore. In these circumstances the following is pertinent:

". . . Inasmuch as the interpretation of statutes is a judicial function, naturally the construction placed upon a statute by an executive or administrative official will not be binding upon the court. Yet where a certain contemporaneous construction has been placed upon an ambiguous statute by the executive or administrative officers, who are charged with executing the statute, and especially if such construction has been observed and acted upon for a long

[1] See 70A Stat 681; 71 Stat 206; 72 Stat 424.

period of time, and generally or uniformly acquiesced in, it will not be disregarded by the courts, except for the most satisfactory, cogent or impelling reasons. In other words, the administrative construction generally should be clearly wrong before it is overturned. Such a construction, commonly referred to as practical construction, although not controlling, is nevertheless entitled to considerable weight. It is highly persuasive." [Crawford, The Construction of Statutes, section 219 (1940).]

See also Black, Construction and Interpretation of the Laws, section 94 (1911). And see United States v Davis, 12 USCMA 576, 580, 31 CMR 162.

Thus, an intriguing question of statutory construction is presented to us and argued with commendable earnestness. However, we have concluded that under the undisputed facts of this case our decision must be placed upon other grounds. We, therefore, pretermit discussion of this question and proceed to what appears to us to be the controlling question herein.

Perhaps, appellant, like thousands before him and many subsequently, grumbled that fate and his local draft board had decreed he be inducted into the military service. However, there is a total lack of evidence that such grumblings were made through the proper channels or followed by the legal actions available to him. He took no appeal from the local board's decision, nor did he resort to any administrative procedure available to him. After reporting for induction and being inducted he did not seek a writ of *habeas corpus*, nor pursue any other legal action to secure his release.

In obedience to the order of his board and after the Army had found him acceptable for service, appellant underwent all ceremonies and requirements the Army had prescribed, including the oath. He was, therefore, actually inducted. Billings v Truesdell, 321 US 542, 88 L ed 917, 64 S Ct 737 (1944); Mayborn v Heflebower, 145 F2d 864 (CA5th Cir) (1944), cert den 325 US 854, 89 L ed 1975, 65 S Ct 1087; Section 462(a), Title 50, Appendix, United States Code.

Moreover, in Mayborn v Heflebower, supra, the Court of Appeals stated:

"We are of the further opinion that whether or not all formalities prerequisite to induction were observed, the subsequent conduct of the parties was such that the irregularities were cured or the right to invoke them was waived. It is manifest that the induction officers regarded appellant as a soldier at all times after the induction ceremony was completed, and appellant voluntarily accepted the benefits and assumed the obligations incident to membership in the armed forces. The idea that a soldier's tenure in the service may be terminated by him at will, or that a selectee may enter the army on a trial basis and stay if he likes it or leave if he does not, is wholly foreign to the military concept in time of war, and diametrically opposed to the necessary policy of any sovereign." [Mayborn v Heflebower, supra, at page 866.]

The Universal Military Training and Service Act, supra, does not prohibit the induction of aliens. Rather, it specifically authorizes and requires such inductions within the limits stated therein and subject to certain forfeitures or restrictions in the event a registrant's status as an alien is utilized to relieve him from the liability for service under the act. See United States v Bean, 13 USCMA 203, 32 CMR 203.

In United States v Mellis, 59 F Supp 682 (MD NC) (1945), the court said:

"Once the selectee becomes inducted as a member of the armed services, he becomes subject to military law and to the penalties for disobedience. It is therefore essential that he must accept the penalties of military law unless he promptly tests his status by habeas corpus. He can not be both a civilian and a soldier."

See also, Gibson v United States, 329 US 338, 91 L ed 331, 67 S Ct 301 (1946).

In 1952 this Court decided, on the

same day, the cases of United States v Ornelas, 2 USCMA 96, 6 CMR 96, and United States v Rodriguez, 2 USCMA 101, 6 CMR 101, in both of which the questions here involved were discussed at considerable length. In *Rodriguez*, where, as here, the accused was also an alien, we said:

"The present case is readily distinguishable from United States v Ornelas, supra. In that case, Ornelas testified that he did not at any time participate in an induction ceremony, and that he did not serve with the Army for any moment of time. Instead it was his contention that he merely took the required physical examination and returned immediately to his home in Mexico. Here, Rodriguez makes no claim that he did not participate in the induction ceremony, but only that he did not take the oath of allegiance. He did not object to service—in fact, he voluntarily entered upon the Army duty assigned. He proceeded to Fort Mac-Arthur for basic training and remained in a military status, apparently without objection, for some ten days. Under such circumstances, he is in no position to claim that he was not lawfully inducted. See Hibbs v Catovolo, 145 F2d 866 (CA5th Cir), cert den, 325 US 854, 89 L ed 1974, 65 S Ct 1085; Sanford v Callan, 148 F2d 376 (CA5th Cir), cert dismd 326 US 679, 90 L ed 397, 66 S Ct 6; Mayborn v Heflebower, 145 F2d 864, 866 (CA5th Cir), cert den, 325 US 854, 89 L ed 1975, 65 S Ct 1087." [United States v Rodriguez, at pages 104, 105.]

See Miller v Commanding Officer, Camp Bowie, Tex., 57 F Supp 884 (ND Tex) (1944); United States v Commanding Officer, Etc., 58 F Supp 933 (Neb) (1945); Ex parte Blazekovic, 248 Fed 327, 341 (1918); United States v McNeill, 2 USCMA 383, 9 CMR 13.

This record reflects that appellant entered the United States in 1957 for the avowed purpose of learning the English language and pursued that objective for a period of six months. Thereupon he returned to Germany, and immediately resumed his employment in the German Merchant Marine. He was employed on a merchant liner which called at American ports each three weeks, during which visits he remained in the United States for a day and a night. Appellant re-entered the United States on a visitor's visa in 1958. He was directed to report to a local draft board, did so, and registered in accordance with the Universal Military Training and Service Act. He completed and filed the required questionnaire.

On December 29, 1958, appellant was directed to present himself for the Armed Forces physical examination on January 13, 1959. On January 5, 1959, he filed a formal written request that his examination be transferred from the New York board, with which he was registered, to a board at Kansas City, Missouri. It is significant that he made no protest therein, and raised no question as to his liability to draft. On January 7, 1959, he was notified by letter that having been admitted to the United States as a temporary visitor, his year of residence would not expire until April 25, 1959. Accordingly, appellant was informed that his pre-induction examination would be cancelled at the board's next meeting, which was done, and his request for transfer of his physical—which previously had been approved—would therefore not be effected. He was duly notified of the cancellation and was reclassified into classification IV–C. Subsequently, he was directed to present himself for the Armed Forces physical examination on June 8, 1959. On June 8, 1959, his qualifications were considered and a certificate of acceptability completed showing him to have been "found fully acceptable for induction into the Armed Services." On July 23, 1959, appellant was ordered for induction into the Armed Forces on August 5, 1959. His local board had some difficulty in locating appellant, as he had returned from Kansas City and his board did not have his correct address in the New York area. After contact was made appellant reported to his local board in New York on August 19, 1959, and on that date was given formal written notice that his induction was postponed from

■■■■■■■■■■■■■

August 5th to August 27, 1959. It is significant that, upon reporting on August 19th, appellant explained in his own handwriting the reasons for his failure to advise the local board of his current address and, although faced with imminent induction, said nothing as to his status as an alien. Appellant appeared for induction on August 27, 1959, and was then inducted as previously indicated herein.

Appellant's correspondence and other documents, all in his own handwriting, indicate that he had accomplished his objective of learning the English language.

Under Title 50, Appendix, United States Code, Section 454(a), supra, "every male citizen of the United States and every male alien admitted for permanent residence," within stated ages, "shall be liable for training and service in the Armed Forces of the United States." A male alien, within prescribed ages, "who has remained in the United States in a status other than that of a permanent resident for exceeding one year . . . shall be liable for training and service." There then follows an "except" provision that such an alien shall be relieved from the liability if, prior to induction, he makes application to be relieved, "but any alien who makes such application shall thereafter be debarred from becoming a citizen of the United States."

After his second admission to the United States, appellant made application that his status as an alien be changed from visitor to one admitted for permanent residence. It is significant that, had such application been granted, appellant would have been liable for immediate induction under the provisions of 50 App USC § 454(a), supra. It is even more significant that on June 8, 1959, the date appellant was "found fully acceptable for induction into the Armed Services," he informed his local board with reference to his alien status, in his own handwriting, and made no protest that he was not liable to induction, but gave only the following:

"I put in application for permanent status and expect my Alien registra-

tion number in about 4 weeks from now. At that time I will bring it to the Selective Service right away. The first time I arrived in the U. S. was on May 24, 1957, the second time on October 1958.

"My temporary B-2 visa has expired on June 2, 1959."

This entire course of appellant's relationship with his draft board makes crystal clear the motivations which caused him to accept induction readily rather than to contest the same. It bears strongly upon the reason for his subsequent conduct in service as a member of the Army for twenty-one months until his personal desire, to divorce his wife and marry another, made it seem advantageous to him that he sever his Army connections, even though in violation of law. It is abundantly clear that he was, lawfully and properly, "actually inducted" and became subject to military law. Title 50, Appendix, United States Code, Section 462(a).

In addition, in an unbroken line of decisions in the Federal courts, during World War I, World War II, and the Korean conflict, and more recently in this Court, it has been held that one who complies with the direction of his draft board, reports, and takes the physical examination; reports, as ordered, for induction; is inducted by the prescribed ceremony; enters upon his military duties, obeys orders, draws his pay, and accepts promotion and leave, is in no position to contend that he is not subject to military law. See the cases herein cited and the cases cited in those opinions.

We therefore overrule the assignment of error that the court-martial lacked jurisdiction over the accused.

II

There remains the assignment of whether the law officer erred in instructing the court on appellant's alleged mistake as to his military status, in circumscribing such belief by the conditions of both honesty and reasonableness.

The appellant was tried upon a single

**485**

charge and specification of having violated Article 86, Uniform Code of Military Justice, 10 USC § 886, by absenting himself from his unit without authority on or about May 17, 1961, and remaining so absent until on or about March 12, 1963.

That absence without leave under Article 86, supra, involves only a general intent; and that in such a general intent case a mistake of fact must be both honest and reasonable in order to constitute a defense, is not an open question in this Court. In United States v Holder, 7 USCMA 213, 22 CMR 3, we specifically so held. Accord, United States v Farris, 9 USCMA 499, 26 CMR 279. See also United States v Perruccio, 4 USCMA 28, 15 CMR 28; United States v McCluskey, 6 USCMA 545, 20 CMR 261.

Manifestly, the instruction of the law officer was correct, and the assignment must be overruled.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.